UNITED STATES NUCLEAR REGU-LATORY COMMISSION, WASH-INGTON, D.C., Petitioner,

v.

FEDERAL LABOR RELATIONS AUTHORITY, Respondent.

National Treasury Employees Union, Intervenor.

FEDERAL LABOR RELATIONS AUTHORITY, Petitioner,

v.

UNITED STATES NUCLEAR REGU-LATORY COMMISSION, WASH-INGTON, D.C., Respondent.

National Treasury Employees Union, Intervenor.

Nos. 93–1704, 93–1851.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 7, 1994.

Decided June 3, 1994.

As Amended June 21, 1994.

---

**ARGUED:** Sushma Soni, Civ. Div., U.S. Dept. of Justice, Washington, DC, for petitioner. Frederick Michael Herrera, Federal Labor Relations Authority, Washington, DC, for respondent. Timothy Brendan Hannapel, Asst. Counsel, National Treasury Employees Union, Washington, DC, for Intervenor. **ON BRIEF:** Frank W. Hunger, Asst. Atty. Gen., Mark B. Stern, Civ. Div., U.S. Dept. of Justice, Washington, DC, for petitioner. David M. Smith, Sol., William R. Tobey, Deputy Sol., Federal Labor Relations Authority, Washington, DC, for respondent. Gregory O'Duden, Gen. Counsel, Barbara A. Atkin, Associate Gen. Counsel for appellate Litigation, National Treasury Employees Union, Washington, DC, for intervenor.

Before MURNAGHAN and NIEMEYER, Circuit Judges, and ELLIS, United States District Judge for the Eastern District of Virginia, sitting by designation.

Petition for review granted and application for enforcement denied by published opinion. Judge NIEMEYER wrote the opinion, in which District Judge ELLIS joined. Judge MURNAGHAN wrote a separate dissenting opinion.

## OPINION

NIEMEYER, Circuit Judge.

The question presented in this case is whether the United States Nuclear Regulatory Commission can be compelled to negotiate with a union for proposals defining employee rights and procedures for investigatory interviews of the Commission's employees conducted by the Office of Inspector General. The National Treasury Employees Union, the authorized bargaining representative of certain Nuclear Regulatory Commission employees, advanced four proposals to the Nuclear Regulatory Commission regarding procedures to be followed during investigatory interviews of the agency's employees by the Inspector General. The Nuclear Regulatory Commission refused to negotiate with respect to these proposals, contending that to do so would infringe on the independence of the Inspector General mandated by the Inspector General Act of 1978, 5 U.S.C. App. 3 § 1 *et seq.* On the Union's petition, filed with the Federal Labor Relations Authority,

the Authority found that the proposals were proper subjects for negotiation and entered an order directing the agency to negotiate. For the reasons that follow, we grant the NRC's petition for review of that order and deny the Authority's cross-application for enforcement.

I .

The Federal Service Labor–Management Relations Statute ("the FSLMRS"), 5 U.S.C. § 7101 *et seq.*, establishes the right of federal employees to form and join labor unions and engage in collective bargaining over conditions of employment. 5 U.S.C. § 7102. The statute requires federal agency officials to "meet and negotiate in good faith [with union representatives] for the purposes of arriving at a collective bargaining agreement." 5 U.S.C. § 7114(a)(4). This duty to bargain exists, however, only to the extent that it is "not inconsistent with any Federal law or any Government-wide rule or regulation." 5 U.S.C. § 7117(a)(1).

During the course of negotiations with the Nuclear Regulatory Commission ("NRC"), the National Treasury Employees Union ("the Union"), which represents NRC employees, submitted four proposals which have given rise to this dispute. The proposals would define employee rights and establish procedures to be followed when agency employees are interviewed or interrogated in connection with both criminal and disciplinary investigations. The parties agree that these investigations would be conducted only by the Office of Inspector General. "Proposal 1" would .give union representatives the right, during investigatory interviews, to clarify questions posed to employees and answers given by them, to suggest the names of other employees with knowledge of the issue, and generally to advise the employees. "Proposal 2" would require an investigator to apprise employees subject to disciplinary action of the general nature of the interview and of the employee's right to have a union representative present at the interview. "Proposal 3" would require an investigator to provide *Miranda* warnings to employees being interviewed for possible criminal conduct. Finally, "Proposal 4" would require similar warnings when the criminal prosecution has been declined but the employees may be subject to dismissal for failure to answer questions.[1]

The NRC refused to negotiate over the four proposals, taking the position that its negotiating contractual limitations on the conduct of investigatory interviews by the Office of Inspector General would be inconsistent with the statutory independence of the Inspector General mandated by the Inspector General Act of 1978. Therefore, ac-

---

1. The language of the Union's proposals is as follows:

*Proposal 1*
Article 3—Employee Rights
Section 3.3.2
When the person being interviewed is accompanied by a Union representative, in both criminal and non[ ]criminal cases, the role of the representative includes, but is not limited to[,] the following rights:
   (1) to clarify the questions;
   (2) to clarify the answers;
   (3) to assist the employee in providing favorable or extenuating facts;
   (4) to suggest other employees who have knowledge of relevant facts; and
   (5) to advise the employee.
*Proposal 2*
Section 3.4
The NRC [Nuclear Regulatory Commission] shall advise the employees annually of their rights to Union representation under Section 3.3. In addition, when an investigation is being conducted and where the employee is a potential recipient of disciplinary action, the employee shall be advised by the investigator

of the general nature of the interview, and of his/her right to be represented by the Union in accordance with Section 3.3.1 and 3.3.2 above, prior to taking any oral or written statement from that employee.
*Proposal 3*
Section 3.4.1
Where the subject of an investigation is being interviewed regarding possible criminal conduct and prosecution, at the beginning of the interview the employee shall be given a statement of *Miranda* rights. The warning shall contain the language listed in Appendix A to this Agreement. If the employee waives his/her rights, the employee shall so indicate in writing and will be given a copy for his/her records.
*Proposal 4*
Section 3.4.2
In an interview involving possible criminal conduct where prosecution has been declined by appropriate authority, at the beginning of the interview the employee shall be given a statement of the *Kalkines* warning in writing. Further, the employee will acknowledge receipt of the warning in writing and shall receive a copy for his/her records.

cording to the NRC, such proposals are not negotiable by virtue of 5 U.S.C. § 7117(a)(1), which establishes the NRC's duty to bargain only to the extent that the proposals are not inconsistent with any federal law. The Union filed a petition with the Federal Labor Relations Authority ("the Authority") pursuant to 5 U.S.C. § 7105(a)(2)(E), to determine whether the proposals were negotiable. In response to the petition, the NRC relied upon the Authority's prior decision in *National Federation of Federal Employees, Local 1300, and General Services Administration*, 18 FLRA 789 (1985) (hereinafter,"*General Services Administration* "), which held that an agency has no duty to bargain over any union proposals purporting to influence the conduct of investigations conducted by the Office of Inspector General. In *General Services Administration*, the Authority stated:

> [I]nsofar as the proposal would seek to have the Agency head utilize his general supervisory authority over the IG [Inspector General] to influence the manner in which that official conducts investigations it impermissibly infringes upon the independence of the IG to undertake such investigations. The intent of Congress ... is that agency officials respect the freedom of the IG to determine what, when, and how to investigate agency operations and that the IG not be subjected to pressure by any part of the agency. Thus, the independence of the IG under law precludes negotiation on proposals purporting to influence the conduct of IG investigations.

18 FLRA at 794–95.

By a decision dated April 9, 1993, the Authority found that the four proposals of the Union were negotiable, concluding that it would no longer follow its earlier decision in *General Services Administration*. Relying on *Defense Criminal Investigative Service v. FLRA*, 855 F.2d 93 (3d Cir.1988) (holding that statutory rights granted to federal employees when being questioned by "a representative of the agency" apply when the questioning is conducted by the Inspector General), the Authority concluded:

> [W]e find that because IG representatives are employees of an agency and, thus, are subject to the agency's obligations under the Statute, an agency cannot declare proposals concerning IG investigations nonnegotiable solely on the ground that, under section 3(a) of the IG Act, all proposals concerning IG investigations are outside the duty to bargain.

47 FLRA No. 29, at 9. The Authority entered an order stating that the NRC "must negotiate" on the proposals submitted by the Union.

The NRC filed a petition for review in this Court, and the Authority filed a cross-application for enforcement of its order.

## II

■ Orders of the Federal Labor Relations Authority are reviewed by the courts of appeals pursuant to a petition for review filed by an aggrieved party or by a petition for enforcement filed by the Authority, 5 U.S.C. § 7123(a) & (b), and the appropriate standard of review is that specified in § 706 of the Administrative Procedure Act. 5 U.S.C. § 7123(c). Thus, the reviewing court will set aside an agency ruling only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In determining whether the Authority's action is "in accordance with law," the reviewing court ordinarily gives deference to the Authority's interpretation of the FSLMRS because the Authority has specialized expertise in this field. *See Social Security Administration v. FLRA*, 956 F.2d 1280, 1283 (4th Cir.1992). In this case, however, the Authority's order was based on its conclusion that the Union's bargaining proposals were not inconsistent with *other* federal law. In particular, the Authority determined that the Union's proposals were not inconsistent with the Inspector General Act of 1978 as it interpreted that Act. Because the Authority does not have special competence in the interpretation of that Act, its legal interpretations of that Act do not deserve any particular deference. *See Internal Revenue Service v. FLRA*, 902 F.2d 998, 1000 (D.C.Cir.1990); *Defense Criminal Investigative Service v. FLRA*, 855 F.2d 93, 97

(3d Cir.1988). Hence, we review the Authority's decision in this case *de novo*.

In the context of the statutory mandate that federal agencies meet with representatives of unions and bargain in good faith for the purpose of arriving at a collective bargaining agreement, except on matters "inconsistent with any Federal law," we must now decide whether the four proposals advanced by the Union are matters that are inconsistent with the Inspector General Act of 1978.

Congress enacted the Inspector General Act of 1978 in order "to more effectively combat fraud, abuse, waste and mismanagement in the programs and operations of ... departments and agencies." S.Rep. No. 1071, 95th Cong., 2d Sess. 1 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2676, 2676 (hereinafter "Senate Report"). To that end, Congress established in each specified governmental agency[2] an Office of Inspector General as an "independent and objective unit," charging each unit with the responsibility of conducting and supervising audits and civil and criminal investigations relating to that agency's operations. 5 U.S.C. App. 3 § 4(a)(1). One of the most important goals of the Inspector General Act was to make Inspectors General independent enough that their investigations and audits would be wholly unbiased:

> There is a natural tendency for an agency administrator to be protective of the programs that he administers. In some cases, frank recognition of waste, mismanagement or wrongdoing reflects on him personally. Even if he is not personally implicated, revelations of wrongdoing or waste may reflect adversely on his programs and undercut public and congressional support for them. Under these circumstances, it is a fact of life that agency managers and supervisors in the executive branch do not always identify or come forward with evidence of failings in the programs they administer. For that reason, *the audit and investigative functions should be assigned to an individual whose independence is clear and whose responsibility runs directly to the agency head and ultimately to the Congress.*

This legislation accomplishes that, removing the inherent conflict of interest that exists when audit and investigative operations are under the authority of an individual whose programs are being audited. *The Inspector and Auditor General would be under the general supervision of the head of the agency or his deputy, but not under the supervision of any other official in the agency. Even the agency head would have no authority to prevent the Inspector and Auditor General from initiating and completing audits and investigations he believes necessary.*

Senate Report at 2682 (emphasis added).

The bulk of the Inspector General Act's provisions are accordingly devoted to establishing the independence of the Inspectors General from the agencies that they oversee. Thus, Inspectors General are appointed by the President and confirmed by the Senate, "without regard to political affiliation and solely on the basis of integrity and demonstrated ability in accounting, auditing, financial analysis, law, management analysis, public administration, or investigations." 5 U.S.C. App. 3 § 3(a). Moreover, only the President, and not the agency head, may remove an Inspector General, and even then the President must provide Congress with his reasons for doing so. 5 U.S.C. App. 3 § 3(b). Inspectors General are required to prepare semi-annual reports to Congress on the results of their investigations, and, even though an agency head may add comments on a report, he or she generally cannot prevent the report from going to Congress or change its contents. 5 U.S.C. App. 3 § 5(b)(1); Senate Report at 2684. Inspec-

---

**2.** In addition to the Nuclear Regulatory Commission, the Inspector General Act created an office of Inspector General in each of the following agencies: the Departments of Agriculture, Commerce, Defense, Education, Energy, Health and Human Services, Housing and Urban Development, the Interior, Justice, Labor, State, Transportation, and the Treasury; the Agency for International Development, the Environmental Protection Agency, the Federal Emergency Management Agency, the General Services Administration, the National Aeronautics and Space Administration, the Office of Personnel Management, the Railroad Retirement Board, the Small Business Administration, the United States Information Agency, and the Veterans' Administration. 5 U.S.C. App. 3 § 11(2).

tors General are required to notify the Attorney General directly, without notice to other agency officials, upon discovery of "reasonable grounds to believe there has been a violation of Federal criminal law." 5 U.S.C. App. 3 § 4(d). Inspectors General are also granted the power to select and employ whatever personnel are necessary to conduct their affairs, to employ experts and consultants, and to enter into contracts for audits, studies and other necessary services. 5 U.S.C. App. 3 §§ 6(a), 7–9. Even though Inspectors General are under the "general supervision" of the agency head and one deputy, neither may "prevent or prohibit the Inspector General from initiating, carrying out, or completing any audit or investigation," 5 U.S.C. App. 3 § 3(a), nor may they transfer "program operating responsibilities" to the Inspector General. 5 U.S.C. App. 3 § 9(a). Most importantly, apart from the limited supervision of the top two agency heads, *no one else in the agency may provide any supervision to Inspectors General:* the Act provides that the Inspector General "shall not report to, or be subject to supervision by, any other officer of [the agency]." 5 U.S.C. App. 3 § 3(a).

Thus, shielded with independence from agency interference, the Inspector General in each agency is entrusted with the responsibility of auditing and investigating the agency, a function which may be exercised in the judgment of the Inspector General as each deems it "necessary or desirable." 5 U.S.C. App. 3 § 6(a)(2). To facilitate that function, the Act gives to each Inspector General access to the agency's documents and agency personnel. The Inspector General may issue subpoenas, administer oaths, and investigate complaints and information from any employee of the agency "concerning the possible existence of an activity constituting a violation of law, rules, or regulations, or mismanagement, gross waste of funds, abuse of authority or a substantial and specific danger to the public health and safety." 5 U.S.C. App. 3 § 7(a).

■ With the provisions and purposes of the Inspector General Act in hand, we now turn to the question of whether it is permissible to subject investigatory interviews conducted by the Inspector General under the Act to contractual limitations through negotiations between the agency and its union. We conclude that proposals which concern investigations conducted by the Inspector General, such as those at issue here, are not appropriately the subject of bargaining between an agency and a union. Such proposals run afoul of the Inspector General Act's mandate that it is the Inspector General who has the authority to "conduct, supervise, and coordinate audits and investigations" relating to the NRC. Congress intended that the Inspector General's investigatory authority include the power to determine when and how to investigate. To allow the NRC and the Union, which represents the NRC's employees, to bargain over restrictions that would apply in the course of the Inspector General's investigatory interviews in the agency would impinge on the statutory independence of the Inspector General, particularly when it is recognized, as the parties do here, that investigations within the NRC are conducted solely by the Office of Inspector General. The four proposals establishing employee rights and procedures for conducting investigatory interviews are therefore inconsistent with the Inspector General's independence and the Inspector General Act. In reaching this result, however, we do not limit the right of the NRC and the Union to negotiate employee rights and procedures for any investigations that may be conducted by other employees of the NRC, who are not from the Office of the Inspector General.

■ The fact that the Inspector General Act provides that the Inspectors General are "under the general supervision" of the agency head does not alter our ruling. Congress did not intend that the power of "general supervision" given to the two top agency heads could be used to limit or restrict the investigatory power of the Inspector General. This intent is manifested by the specific rights and duties conferred exclusively on the Inspector General by the Inspector General Act, as we have already noted above, *see, e.g.,* 5 U.S.C. App. 3 §§ 6 & 7, and is explained by the Act's legislative history. The Senate Report indicates that placing Inspectors General "under the general supervision" of agency heads was not done to give the agency head

any authority over the conduct of investigations. Instead, Congress was fearful that efforts of the Inspector General might be "significantly impaired if he does not have a smooth working relationship with the department head." Senate Report at 2684. The Report expresses hope that placing an Inspector General under the nominal supervision of an agency head would allow the Inspector General to be "his strong right arm ... while maintaining the independence needed to honor [the Inspector General's] reporting obligations to Congress." *Id.* Combining this expressed intent together with the actual provisions of the Act giving powers to the Inspectors General, we cannot conclude that Congress intended for the "general supervision" granted to agency heads to include any authority to compromise the investigatory rights conferred on Inspectors General.

Until this case, the Authority had followed the interpretation that we have expressed. *See General Services Administration, supra.* In light of the Third Circuit decision in *Defense Criminal Investigative Service,* however, the Authority has now abandoned its earlier position. In *Defense Criminal Investigative Service,* the Third Circuit held that the Defense Criminal Investigative Service, which is the equivalent of the Inspector General within the Defense Department, was a representative of the Department of Defense, and therefore, the employees' statutory rights to have union representatives present during an agency investigation, *see* 5 U.S.C. § 7114(a)(2), apply to similar investigations by the Defense Criminal Investigation Service. *See* 855 F.2d at 100–101. The Third Circuit there relied heavily upon the fact that only by viewing Inspectors General as representatives of the agency for this purpose could it effectuate the obvious congressional intent to grant employees certain rights during investigations.

The Authority has chosen to expand the limited holding of *Defense Criminal Investigative Service* [3] in this case to support its newly adopted position that an agency head can negotiate and compromise the investigatory rights of the Inspector General so long as the resulting regime is not otherwise inconsistent with federal law. When that expanded holding is applied to a union proposal here, the result would permit .the NRC to negotiate over whether, for example, a union representative can answer or clarify an answer provided by an employee to an Inspector General during a criminal investigation. *See* Proposal 1, *supra* note 1. Undoubtedly, that would result in an expansion of the union's rights contained in 5 U.S.C. § 7114(a)(2) and would directly interfere with the ability of the Inspector General to conduct investigations.

Had the *Defense Criminal Investigative Service* court been willing to expand its holding to cover the circumstances here, as held by the Authority, it would have been faced with the task of addressing the reason for Congress' inclusion of the provisions in the FSLMRS that exclude Inspector General employees from collective bargaining units. Section 7112(b)(7) provides that no bargaining unit may include employees "primarily engaged in investigative or audit functions." The Authority has, indeed, interpreted this language to mean that employees of the Inspector General may not engage in collective bargaining. *See Small Business Administration & American Fed. of Government Employees Local 2532 & Council 228, AFL–CIO,* 34 FLRA 392 (1990). Having excluded employees of the Office of Inspector General from any collective bargaining, Congress surely could not have intended that other employees in an agency be given the right to negotiate the conditions of work for Inspector General employees.

In summary, if we were to interpret the FSLMRS to require the NRC to bargain over rights and procedures for investigatory interviews conducted by the Inspector General, we would indirectly be authorizing the parties to collective bargaining to compromise, limit, and interfere with the independent status of the Inspector General under the Inspector General Act of 1978. That Act

---

**3.** In *Defense Criminal Investigative Service,* the Third Circuit was careful to note that the term "representative of the agency" as used in 5 U.S.C. § 7114(a)(2) may be defined differently depending on the specific rights and duties at issue. 855 F.2d at 100.

carefully defines and preserves the independence of Inspectors General, both in organization and function, and in the FSLMRS Congress accommodated the Inspector General Act by requiring bargaining only when "not inconsistent" with other laws. *See* 5 U.S.C. § 7117. Because we conclude that the four proposals advanced by the Union here would compromise the Inspector General's independence and would be inconsistent with the Inspector General Act within the meaning of 5 U.S.C. § 7117, we grant the NRC's petition for review and deny enforcement of the Authority's order.

*IT IS SO ORDERED.*

MURNAGHAN, Circuit Judge, dissenting:

As stated well by the majority, the FSLMRS establishes the right of federal employees to engage in collective bargaining. The duty to bargain exists to the extent that it is "not inconsistent with any Federal law or any Government-wide rule or regulation." 5 U.S.C. § 7117(a)(1). Since I do not believe that the process of collective bargaining *per se* "prevent[s] or prohibit[s] the Inspector General from initiating, carrying out, or completing any audit or investigation," *see* 5 U.S.C. App. 3 § 3(a), and therefore is not "inconsistent" with federal law, I respectfully dissent.

It is perhaps well to underscore precisely what question we are asked to answer. We have not been asked, nor could we from the record before us determine, whether the four collective bargaining proposals on the merits are inconsistent with the Inspector General Act. Certainly, an argument *might* be made that each of the four proposals would so constrain the Office of Inspector General that in effect each would "prevent or prohibit" that office from conducting its investigations. Were we in a position to give an answer to the question on the merits and to answer it affirmatively, I could well agree that the four proposals cannot be the subject of collective bargaining.

In the present case, however, the Authority did not reach the merits of the proposals. Rather, because the NRC set forth no specific grounds in opposition to the four proposals and instead relied on *General Services Ad-ministration* to the effect that *all collective bargaining* matters related to Inspector General investigations are nonnegotiable, the Authority determined that there were no grounds upon which it could find that any of the proposals should be considered nonnegotiable on the merits. 47 FLRA No. 29, at 10. The NRC has urged the same all-encompassing, general theory on appeal, stating in its brief that "[t]he *very process of negotiation* would give both management and the union leverage over the IG." (emphasis added).

The Authority rejected such a blanket argument, instead choosing an approach that I believe vindicates the statutory aims of both the collective bargaining statute and the Inspector General statute. It held that "proposals that concern the conduct of IG investigations under the IG Act will be found nonnegotiable if they are inconsistent with the IG Act or are nonnegotiable on other grounds." 47 FLRA No. 29, at 10.

In my view, the Authority's approach preserves the important independence of the Inspector General, by prohibiting collective bargaining proposals that "prevent or prohibit" the conduct of investigations. Such proposals would be "inconsistent" with federal law, and so would be improper subjects for collective bargaining. At the same time, the approach preserves the right of employees to bargain collectively over all matters not inconsistent with federal law.

Moreover, I do not share the majority's conclusion that *Defense Criminal Investigative Service* is significantly distinguishable from the case before us. There, the Third Circuit plainly rejected the argument that the Inspector General Act was intended to create "an independent investigatory office ... which would not be subject to interference by any other agency programmatic concerns, including federal labor relations concerns." 855 F.2d at 98 (internal quotation omitted). Instead, the *Defense Criminal Investigative Service* Court determined that the purpose of the Inspector General Act "was to insulate Inspector Generals (sic) from pressure from agency management which might attempt to cover up its own fraud, waste, ineffectiveness, or abuse." *Id.*

(citation omitted). It seems to me unlikely, and the NRC has not demonstrated, that the "very process" of collective bargaining would impermissibly intrude on the type of insulation described by the Third Circuit.

Finally, I am not persuaded by the majority's argument that *Defense Criminal Investigative Service* and the instant case are distinguishable because in the former at issue was a specific statute conferring a right on employees, while here the rights would derive from collective bargaining. It is plain that federal law entitles federal employees to bargain collectively over proposals not inconsistent with federal law. Neither the Inspector General Act nor the FSLMRS nor the statute considered by the Third Circuit is deserving of more or less statutory dignity than the other. Since the Authority's interpretation of the two statutes at issue here preserves their distinct purposes while preventing a conflict between them, I would affirm.

Accordingly, I respectfully dissent.